AUGUSTUS BOCKES, TRUSTEE, ETC., APPELLANT, v.
HENRY H. HATHORN AND OTHERS, RESPONDENTS.

CHAUNCEY KILMER, TRUSTEE, ETC., RESPONDENT, v.
HENRY H. HATHORN AND OTHERS, APPELLANTS.

*Mortgage to secure the payment of bonds, with coupons attached — an agreement
of the mortgagor to take up the coupons with borrowed money and transfer
them to the lender, amounts to a payment of the coupons as to the bond-
holders — When bonds, paid by the mortgagor and reissued, are void in the
hands of a bona fide purchaser.*

September 1, 1866, H. H. Hathorn and his wife executed a mortgage upon a
hotel in Saratoga to three trustees to secure the payment of bonds to be there-
after issued, not exceeding in amount $400,000. Bonds for that amount were
subsequently issued, payable in ten equal annual installments, with coupons
for the respective installments of principal and interest attached to each bond,
and made payable at the First National Bank of New York.

About September 1, 1874, the Ballston Spa National Bank entered into a written
agreement with Hathorn, and with Hathorn & Southgate, in pursuance of
which Hathorn & Southgate executed notes for $15,000, which were discounted
by the bank in the usual way and placed to Hathorn's credit. The agreement
stated that the bank had put the money into Hathorn's hands for the purpose
of purchasing from the present owners thereof the same amount of the cou-
pons upon the said bonds which were secured by his mortgage; Hathorn
agreeing to apply the money to that purpose, and that the said coupons
should become the property of and be delivered to the bank and remain a lien
on the said premises. In pursuance of this agreement the money was applied
in taking up a corresponding amount of coupons of said bonds. The bond-
holders received the cash for the coupons as they had in former years, with-
out any knowledge of the agreement, and supposing that such coupons were
paid and not that they were bought by the Ballston Bank.

In an action to foreclose the mortgage the said bank claimed to be the owner of
such coupons and to be thereby entitled to share in the proceeds of the sale
with the other bondholders.

*Held*, that the proceeds of the notes discounted by the bank belonged to Hathorn,
and that his application thereof to the taking up the said coupons constituted
a payment thereof.

That his agreement that the bank might hold the same as security for their loan,
though it might be good as between him and it, was of no force or validity as
against the other bondholders.

Upon the trial of the action before the referee evidence was given tending to
show that Hathorn had taken up certain of the bonds by paying to the holders
the amount due thereon, and that thereafter such bonds had been by another
person pledged to secure loans made to him.

*Held*, that as the bonds were private sealed instruments the persons to whom they were transferred took them subject to all equities, not only in behalf of Hathorn but of third persons.

That the referee properly decided that such bonds so reissued were invalid, and that the holders thereof were not secured or protected by the said mortgage.

That as it was proper to determine the amount due under, and which was secured by the mortgage, in order to direct a sale, the referee properly passed upon the validity of the said bonds so reissued, though the holders thereof were not parties to the action.

APPEAL from a judgment entered upon the report of a referee.

The actions were brought to foreclose a mortgage on Congress Hall, a hotel situated at Saratoga Springs.

The mortgage was executed to three trustees by Henry H. Hathorn and wife, and was dated September 1, 1866, being given to secure the payment of certain bonds, thereafter to be executed and issued by the said Henry H. Hathorn, and which were to be countersigned by one of said trustees and were not to exceed $400,000 in amount. The first action was brought by A. Bockes, trustee, etc., to foreclose said mortgage ; and for reasons stated in the complaint, Chauncey Kilmer and John C. Hulbert, the other two trustees, were made defendants therein. The second action was brought by Kilmer, and was in the nature of a cross-bill, and for reasons stated in the complaint therein, A. Bockes, trustee, etc., was made a defendant in the said action. The mortgagors and all other incumbrancers, who were made defendants in the original suit, were also made parties defendant in this cross-action, and in addition thereto John C. Hulbert, one of said original trustees, who claimed title to the personal property belonging to Congress Hall, by virtue of a chattel mortgage thereon, adversely to the trustees, as alleged in the complaint in said cross-suit ; and the Commercial National Bank of Saratoga Springs, and the Ballston Spa National Bank, both of whom make claims to be allowed certain coupons which had been cut from the bonds secured by said mortgage, to the amount of $50,000 and over.

With reference to the claim made by these banks, the referee found :

" 1. On or about the 1st day of September, 1874, the Ballston Spa National Bank entered into an arrangement with the defendant Hathorn, and with Hathorn & Southgate, in writing, as follows :

"BALLSTON SPA NATIONAL BANK, }
"BALLSTON SPA, N. Y., *September* 1, 1874. }

"The Ballston Spa National Bank has put in my hands fifteen thousand dollars for the purpose of purchasing of the present owners thereof, the same amount of the coupons secured by my bonds and the mortgage on Congress Hall property in Saratoga Springs, payable this day, and which I agree to apply to that purpose and no other, said coupons to become the property of and to be delivered to said bank and to remain a lien on said premises.

"H. H. HATHORN,
"HATHORN & SOUTHGATE."

"At the same time they gave their notes for $15,000, which have been renewed from time to time and interest paid up to February, 1876.

"That such arrangement was communicated to the Commercial National Bank of Saratoga Springs, and in pursuance thereof the said Commercial Bank advanced to the holders of the coupons described in schedule 'H,' the amount thereof with the funds furnished by the Ballston Spa National Bank, in pursuance of such arrangement.

"That no part of the money so advanced by the Ballston bank has been repaid.

"That no representations or statements were made by either of the banks holding said coupons to the holders of said coupons, or to any other persons, that the said coupons were paid or extinguished, or that the transaction was anything other than a purchase; nor did they or either of them authorize any such statement or representation, nor were statements to the contrary made or intimated, but the bondholders received the amount of such coupons as they had received the same in previous years, supposing that they were receiving payment of the same.

"2. In the summer of 1874, and prior to September 1, 1874, Mr. Hathorn applied to the First National Bank of New York, where the bonds were made payable, to advance the money and take up coupons falling due September 1, 1874, to the extent of $20,000, and to hold the coupons as security for the amount thus

advanced, notes were given by Hathorn to said bank at a short day, which were renewed and interest was paid from time to time until February, 1876.

" In pursuance of such arrangement the First National Bank of New York did advance its money to the holders of coupons of 1874 to the extent of over $20,000, and the same were transferred to the Commercial National Bank of Saratoga Springs in August, 1875.

" In September, 1874, Mr. Hathorn applied to the Commercial National Bank of Saratoga Springs to advance a further sum to take up and carry the coupons due September 1, 1874, agreeing that the bank should hold them as security for the money so advanced, and under such arrangement the Commercial National Bank of Saratoga Springs advanced the sum of $8,783.40 and received the coupons therefor, and now holds and presents such coupons.

" 3. On the 1st of September, 1875, Mr. Hathorn applied to the First National Bank of New York to advance the money and take up coupons falling due September, 1875, and at his request, and upon the agreement that such coupons should remain and continue a lien upon the mortgaged premises to the same extent as in the hands of the original holders, the First National Bank advanced to the holders of such coupons the sum of $23,746.50 and now holds the same. Notes were given at the time of such arrangement to the amount of $20,000.

" 4. About the 1st of September, 1875, Mr. Hathorn applied to the Commercial National Bank of Saratoga Springs to advance to the holders of coupons due September 1, 1875, the amount then due, and agreed that any coupons so taken by the Commercial National Bank should remain secured by the mortgage to the same extent as in the hands of the original holders. Mr. Hathorn then represented and stated that he was negotiating a loan sufficient to pay off all the incumbrances upon his property, and that such loan would be perfected in a very short time. That in case of any failure to complete such loan he should sell the property to Mr. A. T. Stewart, and pay off all these incumbrances before the 1st of December, 1875 ; that in pursuance of such arrangement and request the Commercial National Bank advanced to the holders

the sum of $25,741.20, and received the coupons and now presents the same ; that many of the holders of Congress Hall bonds deposited their coupons in the same manner that they deposited other coupons and drafts on New York with the First National Bank of Saratoga Springs, the Union Savings Bank of Saratoga Springs, and the Saratoga Savings Bank of Saratoga Springs, with which they severally kept their accounts, and the same were received by the Commercial National Bank from such corporations. Mr. Leake, the cashier of the First National Bank and president of the Union Savings Bank, was notified of the arrangement and that Mr. Hathorn had no money with which to pay such coupons. No portion of the money so advanced by the Commercial National Bank has ever been repaid to it, nor have they received any note or other obligation or security for the said coupons, except the coupons themselves."

*Charles S. Lester*, for the appellants, Bockes, Lester and Richards.

*John T. Carr*, for the appellant, The Commercial National Bank.

*George G. Scott*, for the appellant, The Ballston Spa National Bank.

*L. B. Pike*, for the appellants, Hathorn & Southgate.

*A. Pond*, for the respondents, Kilmer and Deuel, trustees, etc.

LEARNED, P. J. :

The first action was commenced by Augustus Bockes and Chauncey Kilmer, two of the trustees of a mortgage for bondholders, to foreclose the same. The third trustee was made a party defendant, because he was also a trustee in a second mortgage. After it had been commenced, Kilmer refused to continue as plaintiff, and was, by order, made defendant.

Kilmer then commenced the second action as trustee, making the other trustees parties, and making others defendants, and asking a foreclosure. The complaint also set up matters alleged

to make an equitable lien on personal property, and also matters tending to show that some of the bonds and coupons had been paid or extinguished.

To the complaint in this second action demurrers were interposed. On argument before Justice LANDON the demurrers were sustained. After the demurrers had been sustained; all the parties to both the actions united in a stipulation, by which it was agreed, among other things, that the order sustaining the demurrer and the appeals therefrom be waived, vacated and set aside; that the actions be tried together on the pleadings and on the proofs to be submitted at the trial on a reference, and that all matters and questions involved therein be submitted on such trial, to be there passed upon. On this stipulation an order of reference was made, and the actions were tried. The referee's report passes on the matters in dispute between the parties, and settles their rights. Among other things he decides that the plaintiff in the second entitled action is entitled to judgment on the demurrer, but without costs. One of the questions made on this appeal is on the correctness of that decision.

So far as we can see, this presents merely a question of costs. The matters of fact, alleged in the complaint in the second action, in regard to the alleged payment of bonds and coupons, and other similar questions, seem to have been litigated before the referee and to have been decided by him. Some of these matters, as we have had occasion to suggest on a previous occasion, might more properly have been tried, after a foreclosure and sale in a proceeding for the distribution of the avails held in trust. That seems to have been the view taken, and we think correctly, by the able counsel who commenced the first action. If that course had been followed, there would have been less delay, perplexity and costs. The property could have been sold speedily, as a sale was unquestionably necessary, and when the avails were in the hands of the trustees they could have proceeded, under the authority of the court, to divide them among rightful claimants. But in fact another course was followed, and the referee has examined and passed upon the claims of the bondholders and holders of coupons before the sale of the property had been adjudged. In doing this he seems to have tried the allegations set up in the complaint

in the second action as matters of fact, as if there had been an answer. And we think that this was the intention of the stipulation. The parties would hardly have stipulated away a decision upon a demurrer, merely to have another decision thereon made by the referee. Such a course would have been meaningless. And it will be noticed that, in regard to both actions, the stipulation is that they are to be tried on pleadings and proofs. Of course there would be no proofs in the second action, if only the demurrer was to be argued. In our opinion, then, we see no reason for examining a point which was practically waived by proceeding with the trial, and by vacating the order, and which can only be material upon the question of costs.

On the merits of the case an appeal is taken by the plaintiff in the first action in behalf of certain banks and parties, and also by certain banks in their own names. The questions to be raised on the case seem to be confined to the rejection of certain coupons and certain bonds.

There is no judgment over for deficiency. The mortgaged premises are directed to be sold, and the avails, after costs, etc., to be paid to the trustees of the first mortgage. From the avails the trustees are directed to pay certain bonds and coupons mentioned in the report of the referee, issued under the first mortgage, and to hold the balance to await the order of the court. It does not appear that the owner of the equity of redemption, or the trustees of the second mortgage, have appealed from the judgment on the merits. The trustees of the second mortgage appealed from the overruling of the demurrer in the second action. But that does not affect the merits. The appeals, therefore, are really from that part of the judgment which determines the distribution of the avails in the trustees' hands.

The bonds secured by this mortgage were executed by Hathorn, payable in ten equal annual payments with interest. The coupons attached to each bond were for the respective installments of principal and for the interest on unpaid principal, and were payable at the First National Bank, New York.

About September 1, 1874, the Ballston Spa National Bank entered into a written agreement with Hathorn and with Hathorn & Southgate. They gave their notes to the bank for $15,000,

which were discounted in the ordinary manner. And they signed an agreement stating that the bank had "put into my (Hathorn's) hands $15,000 for the purpose of purchasing of the present owners thereof the same amount of coupons secured by my bonds and the mortgage, etc., payable this day, which I (Hathorn) agree to apply to that purpose and no other; said coupons to become the property of and to be delivered to said bank, and to remain a lien on said premises." In pursuance of that arrangement, communicated to the Commercial Bank, that bank, about the 1st of September, 1874, cashed certain coupons to the amount of $14,569.20, for which amount Hathorn drew on the Ballston Spa Bank, in favor of the Commercial Bank, on or before September 8, 1874. The money thus advanced by the Ballston Spa Bank has not been repaid. The bondholders who received the cash for these coupons received the same, as they had done in former years, supposing the coupons to be paid thereby.

The question is, as between the Ballston Spa Bank and the bond-holders, did the bank pay these coupons on Hathorn's behalf, or buy them on its own? The written agreement is distinct on that point. Hathorn, the mortgagor, borrowed the $15,000 of the bank, giving the security also of Southgate. The borrowed money then became his. He drew for it by his check. He agreed to apply it to these coupons, and he did so. An application by Hathorn of Hathorn's money to Hathorn's debt was a payment. That he should agree with the bank that, after he had paid his debt, they might hold his paid debt as security for their loan to him might be good between him and them, but could not be good against others. (*Harbeck* v. *Vanderbilt*, 20 N. Y., 395.)

In *Union Trust Co.* v. *Monticello and P. J. R. Co.* (63 N. Y., 311), Smith was not allowed to share *pro rata*, although he was not himself the mortgagor or debtor, but a volunteer. In *Ketchum* v. *Duncan* (96 U. S., 662), the firm of Duncan, Sherman & Co. had advanced money and bought coupons. They had not loaned money to the railroad company. The court in its opinion states, as beyond doubt, that the coupons were not paid with money or funds furnished by the railroad company, and that they were not paid by any one, in pursuance of an agreement made with

the railroad company to pay for them, or on behalf of the debtors. But in the present case the Ballston Bank lent the money to Hathorn, and he paid the coupons. It matters not that he did this through the Commercial Bank. That bank acted on his behalf, and the payment was his. The agreement expressly states that *he* was to apply the money to the purchasing of the coupons. And although he then agreed that they should be delivered to the bank, and remain a lien on the premises, yet they had in fact been paid. (*Comm. of Virg.* v. *Ches. and O. Canal Co.*, 32 Md., 501.)

If the Ballston Bank had sued Hathorn on the coupons, it would have been a perfect defence that he had borrowed the money of the bank with which he had paid the coupons, and that his liability was only on his notes when they should become payable.

The facts in regard to the First National Bank of New York are similar. The coupons were payable at that bank. Hathorn applied to the bank for assistance and an advance of money to meet coupons coming due September 1, 1874. To obtain this, he gave his notes (or the notes of Hathorn & Southgate) at a short date, which were renewed from time to time. The amount of the notes was $20,000. In pursuance of this arrangement, the First National Bank of New York did advance money for the coupons of September, 1874, to the amount of over $20,000. To meet the excess over $20,000, Hathorn borrowed of the Commercial National Bank of Saratoga, on his note, some $8,000, and sent the amount to New York. This was upon a promise that the Commercial Bank should hold the coupons as security ; and the bank received and holds coupons to the amount of $8,783.40.

In August, 1875, the First National Bank of New York wanted the money which had been advanced to Hathorn for the coupons of September, 1874. And Hathorn made arrangements with the Commercial Bank to advance the money and to take up this $20,000 ; and he agreed to deposit money to apply on this $20,000. Hathorn did deposit with the Commercial Bank some $15,000 to apply thereon ; which amount, the Commercial Bank, with his consent, afterwards applied to other purposes.

The Commercial Bank thus, about that time, received these coupons from the First National Bank.

In September, 1875, Hathorn again made a similar arrangement with the First National Bank, in respect to the coupons of September, 1875, giving his notes to the amount of $20,000; and the bank advanced somewhat more than that amount.

About August, 1875, Hathorn made a similar arrangement with the Commercial Bank of Saratoga, stating that he expected to make a loan during the fall, or to sell to Stewart, and agreeing with the bank that it should take and hold the coupons for a short time, not longer than till he went to Congress in December. He was to take them up before he went to Congress. No security was given to the bank; and under this arrangement the bank took about $25,000 of coupons.

There seems to be no doubt that, in all these cases, the holders of the bonds received the money for their coupons in the same manner as if the coupons had been paid. There was no intention on the part of the bondholders to sell, and not to collect, their coupons. They were often deposited, in the usual manner of collecting such securities, with the bank where the bondholder did business. Although the coupons were payable in New York, it is well known that the ordinary method of collecting coupons, payable in another place, is to deposit them in a bank for collection. On being thus deposited they are passed to the credit of the depositor, and would be charged back against his account if not paid; and, therefore, there is not any evidence that the holders of these coupons intended to sell them. The counsel for the bond-holders offered affirmative evidence on this point, which the referee intimated to be unnecessary.

To make a sale or transfer requires two parties. One cannot be made a seller without his knowlege. A seller impliedly warrants the paper to be genuine. He cannot be drawn into this implied warranty without his consent. (*Lancey* v. *Clark*, 64 N. Y., 209.) The circumstances in regard to all these transactions we consider substantially alike. In whatever form the business was done it was practically a loan, made at Hathorn's request, to him, for his benefit, and used by his direction in the payment of his debt. The coupons were therefore paid, not pur-

chased. (*Garr* v. *Martin*, 20 N. Y., 306; *Dodge* v. *Brown*, 113 Mass., 324; *Shumway* v. *Cooley*, 9 Hun, 132.)

In the case of *Haven* v. *Grand Junction R. R. and D. Co.* (109 Mass., 88), cited by the appellant's counsel, Kimball, the president of the company, had advanced money to pay the coupons; but the security in that case proved sufficient to pay the whole debt, principal and interest; and all that the court decided was that Kimball's claim for the coupons should be good, *after* the payment of the other mortgage creditors and other claims. And so, in this case, it was not held by the referee that the banks might not have an equity after the payment of the other bond-holders. It was only in respect to the other bond-holders that the claims of these banks were disallowed.

Another question presented is in regard to certain bonds claimed to have been paid and then reissued. The facts that these bonds had been in fact regularly issued; that they were taken up by Hathorn and paid, and that after such payment they were pledged by Frank H. Hathorn to secure a loan to him, do not seemed to be questioned on this appeal. The appellant insists that, as the savings bank, the holder of these bonds, was not a party to the action, a judgment deciding that these bonds were not valid should be reversed.

The savings bank, it is stated in the points, presented these bonds for allowance. If this be so, then it would seem proper that the referee should decide on the claim. At any rate, it might be important to ascertain the extent of the mortgage debt in order to decree a sale. And it would seem to be proper, therefore, that the trustees should have shown on the hearing how much was secured by the mortgage, as the plaintiff would do in any other action of foreclosure. The trustees, in behalf of their *cestui que trusts*, would prove the amount secured, giving probably an opportunity for any *cestui que trust* to give evidence on his own account. We do not think, then, that the judgment should be reversed, merely for the reason that the savings bank was not a formal party.

If these bonds had been once paid in fact, the finding of the referee seems to be correct, that they could not be lawfully reissued. The bonds were private, sealed instruments; speci-

alities, not promissory notes. The persons to whom Frank H. Hathorn transferred them took them subject to all equities, not only in behalf of Hathorn, but of third parties (*Greene* v. *Warnick*, 64 N. Y., 220), and certainly as to other bondholders they had been paid.

The judgment should be affirmed, with costs, in favor of the respondents and against the appellants (not the trustees), and the parties in whose interest the appeal was taken.

Present — LEARNED, P. J., and BOARDMAN, J.

Judgment affirmed, with costs, in favor of respondents against appellants (not the trustees), and against the parties in whose interest the appeal was taken.